ALFREDO NEGRÓN, demandante y apelado, *v.* LA SUCESIÓN DEL DR. ELADIO MARÍA IZQUIERDO Y SERRANO, demandada y ape·lante.

No. 6192.—*Sometido:* Febrero 2, 1934. *Resuelto:* Mayo 4, 1934.

*R. Rivera Zayas,* abogado de la apelante; *R. Buscaglia,* abogado del apelado.

EL JUEZ ASOCIADO SEÑOR CÓRDOVA DÁVILA, emitió la opinión del tribunal.

Es ésta una acción de filiación ejercitada por Alfredo Negrón para que se le declare hijo natural del Dr. Eladio María Izquierdo Serrano. Se alega en la demanda que el Dr. Izquierdo falleció en Morovis, Puerto Rico, el día 10 de octubre de 1931; que el demandante, Alfredo Negrón, nació el día 3 de agosto de 1903, en el pueblo de Toa Alta, Puerto Rico y que es hijo natural de doña Nicomedes Negrón y del Dr. Eladio María Izquierdo Serrano; que en la época de la concepción y nacimiento del demandante, su madre, doña Nicomedes Negrón, vivía en concubinato con don Eladio María Izquierdo Serrano; que desde la fecha del nacimiento del demandante, el Dr. Izquierdo lo tuvo bajo su amparo y protección, habiéndole llamado "hijo" en público y en pre-

sencia de sus amigos y habiendo cuidado de su alimentación, sostenimiento y educación y bienestar; que durante la época de la concepción y el nacimiento del demandante sus padres antes mencionados, doña Nicomedes Negrón y don Eladio María Izquierdo Serrano, eran solteros, no habiendo relación de parentesco alguno entre ellos ni ningún otro impedimento legal que les impidiera casarse uno con el otro, con dispensa o sin ella.

Admiten los demandados que durante la época de la concepción y nacimiento del demandante, doña Nicomedes Negrón y don Eladio María Izquierdo Serrano eran solteros, y que no existía relación de parentesco entre ellos, pero niegan que no existiera impedimento legal que les impidiera contraer matrimonio entre sí, con dispensa o sin ella, o en alguna otra forma, pues durante la fecha a que se refiere la demanda el Dr. Izquierdo era un sacerdote católico, consagrado activamente al ejercicio de su ministerio. Se niegan además todos los hechos esenciales de la demanda y se alega que la misma no contiene hechos suficientes para constituir una causa de acción.

La corte inferior dictó sentencia declarando a Alfredo Negrón hijo natural reconocido de Eladio María Izquierdo Serrano, con todos los derechos inherentes a su filiación. El primer error atribuído a la corte inferior consiste en haber desestimado dicho tribunal la excepción previa de falta de causa de acción. Los demandados basan esta excepción en que no se expone ni un solo hecho en la demanda, limitándose el demandante a transcribir las disposiciones del Código Civil Revisado sobre los casos en que un padre está obligado a reconocer a un hijo natural.

Ésta es una cuestión decidida ya por este tribunal, resolviendo excepciones de falta de hechos en acciones de filiación, donde las alegaciones de la demanda han sido más o menos iguales a las que han servido de base a la excepción de los demandados.

En el caso de *Ramos* v. *Sucesión Cabán,* 18 D.P.R. 534,

se alegó que Juan Tomás Cabán, en sus relaciones amorosas con María Ramos, tuvo al demandante Prudencio Ramos, quien pública y privadamente fué siempre tenido por su padre, Juan Tomás Cabán, como hijo suyo; y que al tiempo de la concepción y nacimiento del demandante, sus referidos padres eran solteros y estaban en aptitud de contraer matrimonio. Refiriéndose a estas alegaciones, dijo la corte:

"Esos hechos constituyen las alegaciones esenciales que es necesario establecer en un caso de esta naturaleza. Los diferentes actos ejecutados por el padre, demostrativos del reconocimiento, debían ser y fueron objeto de la prueba durante el juicio, prueba que se practicó además sin la oposición de la parte contraria."

En el caso de *Vega v. Sucesión Vega,* 32 D.P.R. 596, se alegó en la demanda que la demandante era hija de Laó Vega y de Venancio Vega, quienes sostuvieron relaciones amorosas, naciendo como consecuencia de ellas la demandante el 25 de julio de 1899; que Venancio Vega visitaba la casa de Laó diaria y públicamente y sostenía sus gastos; que desde el nacimiento de la demandante su padre la tuvo bajo su amparo, la sostuvo, la llamó hija suya en público y en presencia de sus amigos, realizando con ella actos de padre para con su hija, no interrumpidos durante toda su vida, y que durante la concepción y alumbramiento de la demandante, sus padres eran solteros y estaban en condiciones de contraer matrimonio. Esta corte dijo que, aunque en realidad la demanda pudo ser más específica, no cabía concluir que dejara de alegar hechos suficientes tendentes a establecer el estado de hija natural reconocida. Lo mismo decimos en el presente caso, debiendo añadir que los diferentes actos ejecutados por el padre y por su familia, demostrativos del reconocimiento, fueron objeto de prueba durante el juicio, sin oposición de los demandados. Debe desestimarse el primer error.

■ Se alega en segundo término que la corte cometió manifiesto error y actuó movida por prejuicio y parcialidad en la apreciación del testimonio de los testigos, dándoles

credibilidad a pesar de la forma inconsistente en que declararon y calificando de actos de reconocimiento los declarados por dichos testigos como realizados por el supuesto padre natural, sin que la prueba referente a estos actos demuestre una intención clara y expresa de reconocimiento, ni sea dicha prueba vigorosa y convincente. Se alega que los actos calificados erróneamente por el juez, con pasión y prejuicio, como significativos de reconocimiento, consisten primordialmente en que el supuesto padre natural llamara algunas veces "hijo" al demandante y en ciertos actos de ayuda que de acuerdo con las circunstancias de este caso no pueden considerarse sino como demostraciones de interés y de generosidad, ajenas a todo reconocimiento.

La corte inferior, en sus conclusiones de hecho, se expresa así con respecto a la prueba testifical aportada por la parte demandante:

"Aparece de la prueba practicada por el demandante que en el año 1903 Nicomedes Negrón era una mucama de doña Manuela Serrano, madre del doctor Eladio Izquierdo y Serrano, en el pueblo de Toa Alta, que el doctor Izquierdo era entonces sacerdote católico y residía en su parroquia de Toa Baja; que él iba dos veces todas las semanas a Toa Alta a visitar a su señora madre, pernoctando en ese hogar; que durante sus estadas en casa de doña Manuela él sostuvo relaciones carnales con la citada Nicomedes Negrón, quedando ésta embarazada o encinta; que doña Manuela Serrano, al observar el estado grávido de la Negrón, la requirió para que la informara de quién estaba encinta y ésta le manifestó que de su hijo, y eso motivó la salida de la Negrón de la casa de doña Manuela; que el doctor Izquierdo alquiló una casa propiedad de Elvira Martínez, ubicada en la calle de los Mangoes de Toa Alta, y allí llevó a vivir a Nicomedes Negrón, visitándola todas las tardes, quedándose allí a dormir durante las noches regresando por las mañanas a Toa Baja; que el doctor Izquierdo sufragaba todos los gastos de manutención; que en ese estado de cosas Nicomedes Negrón dió a luz el 16 de diciembre de 1903 un niño varón al que se le puso el nombre de Alfredo y fué inscrito en el Registro Civil como hijo natural de la Negrón; que el doctor Izquierdo cubría todas las atenciones de la Negrón y del niño nacido; que cuarenta días después de nacido este niño el doctor Izquierdo envió a Nicomedes Negrón con el niño a casa del padre de la

primera, que residía en el campo, le dió una vaca parida para la alimentación del niño y le dijo que más tarde le entregase el niño a doña Manuela Serrano para su cuido; que teniendo el niño dos años de edad fué entregado a doña Manuela Serrano con quien vivió hasta que fué un joven; que durante esos dos años todos los gastos y manutención del niño fueron sufragados por el doctor Izquierdo; que cuando el niño estuvo en poder de doña Manuela, el doctor Izquierdo marchó a estudiar a Estados Unidos a cursar otros estudios y regresó teniendo ya Alfredo diez o doce años, desde cuyo momento continuó atendiendo personalmente a todas las necesidades del menor, y le llamaba pública y privadamente hijo; que en 1925 Alfredo casó y el doctor Izquierdo arrendó una finca para que Alfredo residiera en ella y la explotara en su propio beneficio; y así ocurrió que allí iba a visitarle el doctor Izquierdo y en presencia de testigos llamaba a Alfredo 'su hijo'; que con motivo de que los negocios en la finca no tuvieron éxito, él le mandó entonces a Santo Domingo, dándole dinero para el viaje, de donde regresó Alfredo con motivo del ciclón, recibiendo la ayuda inmediata del doctor Izquierdo; y que en cierta ocasión ambos vivieron juntos en Cataño, en relaciones de padre e hijo.

"Todos estos hechos aparecen de las declaraciones de Nicomedes Negrón, Pedro Rivera, Carlos Rivera, Cándido Santiago, Simplicio Santiago, Angel Ortega y Alfredo Negrón, con minuciosos detalles, y exposición de circunstancias. No fueron controvertidos en forma alguna. Se presume que todo testigo dice la verdad. Esta presunción puede ser destruída o rechazada por su manera de declarar, por el carácter de su testimonio, por evidencia que afecte a su integridad, motivos o por evidencia contradictoria. Nada hay que tienda a destruir esa presunción.

"La única prueba ofrecida por los demandados es una tendente a establecer el hecho no negado por el demandante y por el contrario aceptado de que el doctor Izquierdo en la época a que se refiere lo de la concepción y nacimiento del niño era un sacerdote católico.''

Los demandados arguyen que la prueba presentada en este caso no demostró que el Dr. Eladio María Izquierdo tuviese la intención de reconocer, y que reconociera como hijo natural suyo, a Alfredo Negrón. Se añade que de acuerdo con la jurisprudencia no basta que una persona realice algunos o muchos actos de benevolencia, cariño, protección e interés respecto de otra para que se pueda afirmar

un reconocimiento de paternidad, que es una cosa de suyo tan grave y de tal trascendencia para la paz, el orden y la economía de la familia.

El artículo 189 del Código Civil Revisado, en vigor cuando nació el demandante, dice en lo pertinente lo que sigue:

"El padre está obligado a reconocer al hijo ilegítimo en los casos siguientes:

"*      *      *      *      *      *      *

"2. Cuando pública o privadamente le tenga por hijo suyo o le haya llamado tal en conversación o se ocupe de su educación y sostenimiento.

"3. Cuando la madre fué conocida viviendo en concubinato con el padre al tiempo del embarazo o nacimiento del hijo, o cuando éste haya nacido llevando sus padres relaciones amorosas."

La corte inferior descarta el concubinato por no haber sido probado y dicta su sentencia basándose en el inciso segundo del artículo anteriormente copiado. Las conclusiones del tribunal sentenciador han quedado establecidas por una prueba clara y abundante. "Desde el día que Alfredo Negrón nació," dice la corte inferior, "su padre se encargó de establecer su estado legal, teniéndole pública y privadamente por hijo suyo, y llamándole tal en sus conversaciones y ocupándose de su sostenimiento." "Estos actos," continúa diciendo la corte, "más que aislados, constituyen una serie ininterrumpida de relaciones entre padre e hijo. Cuando eso se prueba, puede obtenerse la declaración de hijo natural."

Los demandados en su alegato analizan la evidencia aportada y tratan de desacreditar el testimonio de los testigos. Esta prueba no fué controvertida. La corte inferior declara que es convincente, y nosotros así lo creemos. Los actos realizados por el Dr. Izquierdo bastan por sí solos para dejar establecidas las alegaciones de la demanda. A estos actos hay que añadir la conducta para con el demandante de la madre del Dr. Izquierdo, acogiéndolo en su hogar, donde vivió hasta que se hizo hombre. Hemos examinado la prueba

en todos sus detalles y podemos decir que todas y cada una de las conclusiones de hecho del juez sentenciador están justificadas por esa prueba, la cual ha sido apreciada con acierto y serenidad, y no con parcialidad y prejuicio, como alegan los demandados. Puede que algún testigo haya incurrido en exageraciones; pero la prueba en conjunto nos da la sensación de la verdad y resulta convincente, como afirma la corte inferior.

■ Se alega en último término que la corte erró al declarar que el demandante reunía las condiciones exigidas por la ley vigente en la época de su nacimiento, para ser considerado como hijo natural, capaz de ser objeto de un reconocimiento, pues teniendo en cuenta el carácter sacerdotal del supuesto padre putativo, y siendo el matrimonio una institución procedente de un contrato, tal contrato sería completamente nulo, de acuerdo con las leyes vigentes.

Arguyen los demandados en su alegato, por conducto de su abogado, que con anterioridad a la aprobación del Código Civil Revisado, existía la prohibición a las personas ligadas por solemne voto de castidad religiosa para contraer matrimonio, y dicen:

"Con el advenimiento de las instituciones angloamericanas, el Código Civil Revisado deja fuera esa prohibición, pero lo que no ha podido eliminar del espíritu puertorriqueño, de la creencia y de la tradición de la sociedad puertorriqueña, que es enteramente católica, es el postulado de moral pública (*public policy*) de que un sacerdote católico, por la esencia de su sagrado ministerio y por la solemnidad de sus votos de castidad, no puede en modo alguno contraer matrimonio al menos mientras esté en el activo ejercicio de su ministerio.

"Y este último aspecto de la cuestion plantea un problema interesante dentro del derecho civil. De acuerdo con el código el matrimonio es una institución civil que procede de un contrato y de acuerdo con el propio código no puede celebrarse un contrato válido que ofenda y contravenga las costumbres y la moral pública y si la moral pública en nuestra sociedad está opuesta al matrimonio de los sacerdotes católicos, mirada esta cuestión desde el punto de vista de los contratos, podría sostenerse que el contrato matrimonial de un

sacerdote en el activo ejercicio de su ministerio, quebranta la moral pública y sería nulo.''

Resolviendo la cuestión planteada por los demandados, dice el Juez Samalea Iglesias en su relación· del caso y opinión:

''Los razonamientos de la parte, que merecen nuestros más profundos respetos, no pueden, a la hora de decidir la cuestión envuelta en este caso que ha de serlo necesariamente a la luz de nuestros preceptos estatutarios, desviar las claras ·consecuencias de un estado civil que tiene sanción, reconocimiento y amparo taxativos en la ley.

''Esta no habla de que sea un impedimento legal para contraer matrimonio los votos religiosos que haya contraído una persona; y ese silencio de la ley civil no podemos nosotros suplirlo incorporando al precepto una adecuada disposición. Aquí un viejo aforismo legal toma cuerpo y se manifiesta: '*Expressio unius est exclusio alterius.*' Hasta 1902 era imposible el casamiento de un profeso en religión, porque así lo estatuía la ley; pero desde la promulgación del Código Civil Revisado, nada hay que lo prohiba, por lo que un hijo nacido fuera de matrimonio, no obstante tener uno de sus padres la condición de profeso, puede aspirar a la legitimación. El concepto de hijo espúreo por sacrílego desapareció de nuestras instituciones jurídicas al impulso de las ideas reinantes en las modernas legislaciones. Aquella nomenclatura tiene hoy, para nosotros, el solo recuerdo de las cosas que fueron. El clérigo regular, el que se liga a la ·Iglesia con los tres votos solemnes de pobreza, obediencia y castidad, no está impedido por nuestras leyes de contraer matrimonio. Esto podrá estar en pugna con los cánones de la Iglesia Católica, pero no con nuestras leyes. El único motivo que puede inducir a rechazar este medio procede, por tanto, de otro orden de consideraciones que el de puro derecho civil puertorriqueño. Faltará a sus deberes el sacerdote que prescindiendo de las disposiciones de la Iglesia huye de su voto de castidad y procrea un hijo, pero no consienten nuestros principios de derecho civil que tal falta pueda por sí anular el derecho del hijo a reclamar su legitimación y permitir que se desate el vínculo.

''En ausencia de algún principio de derecho constitucional o estatutario de política pública, o parecido, las partes pueden celebrar los contratos que tuvieren a bien. *Clausells* v. *Comercial,* 37 D.P.R. 117. La sucesión demandada ataca la libertad de los padres del demandante para efectuar un contrato matrimonial por razón de los votos

668

religiosos del padre, fundándose en principios filosóficos de política pública y moralidad, e invoca para ello el art. 1222 del Cód. Civil.

"Es cierto que el citado artículo prohibe que en los contratos se estipulen pactos, cláusulas y condiciones que sean contrarias a las leyes, a la moral o al orden público. Pero no vemos razón legal alguna para que deje de ser lícito, por lo que respecta a la moral y al orden público, un contrato matrimonial entre partes de las cuales una es profesa en religión. Tal pacto no reúne ninguno de los caracteres a que se refiere el artículo citado. La ley, al hacer relación a la moral, lo hace refiriéndose a aquellos principios o preceptos morales no discutibles y sí generalmente admitidos. Estos, por lo común, no conciernen al orden jurídico sino al fuero público o al respeto humano. Y el orden público a que alude la ley es aquel que representa el interés público, social y de ley en el derecho privado.

"Nos damos perfecta cuenta de la solemnidad de una promesa como la hecha a la Iglesia por aquellos varones que son investidos con los atributos sacerdotales, más ello no puede lograr impedir el reconocimiento por los tribunales de justicia de las consecuencias naturales y probables de sus actos . . . ."

*Debe confirmarse la sentencia apelada.*